WEINER *v.* CUYAHOGA COMMUNITY COLLEGE DIST. ET AL.

[Cite as Weiner v. Cuyahoga Community College Dist., 15 Ohio Misc. 289.]

(No. 861411—Decided July 12, 1968.)

Common Pleas Court of Cuyahoga County.

*Messrs. Thompson, Hine & Flory,* for plaintiff.
*Messrs. Squire, Sanders & Dempsey,* for defendants.

LYBARGER, J. 1. The plaintiff, Hyman R. Weiner (hereinafter called the plaintiff), brings this suit as a taxpayer's action against Cuyahoga County Community College and its trustees (hereinafter called the "College"), alleging that what defendants have done, in the situation narrated below, "amounts to a gross abuse of discretion conferred upon them by statute * * *, illegality in its bidding process, and that the College's * * * bid specifications were insufficient and therefore contrary to law, since they did not set forth specific and definite standards." Plaintiff seeks to enjoin the College from awarding the construction contract to anyone but the alleged "lowest and best bidder."

2. The College admits many of the plaintiff's factual allegations of the course of events between the parties before suit. It denies, however, plaintiff's conclusions that charge the College with gross abuse of discretion, acts in violation of the very laws on which the College bases its defense, and lack of sufficiency of its bid specifications.

3. The plaintiff is a principal officer of Reliance Mechanical Contractors, Inc., hereafter called "Reliance." It is Reliance's dispute with the College that is the chief concern of the suit.

4. Reliance was among the bidders on the ventilating, air conditioning and heating work on Phase III of constructing the College's metropolitan campus. Reliance's bid, on the mechanical part of the job, proved to be the lowest and best bid, at least monetarily, and it was for the time being accepted, subject to approval as required by federal law. (Minutes of meeting, April 11, 1968, of trustees of the College, plaintiff's exhibit 16, page 62.)

5. The evidence shows that the College bought from the city of Cleveland the land on which the building will stand, under an agreement anticipating that the College would redevelop the land under the requirements of the proper agencies of the federal government. This made the College amenable to federal laws setting up bidding practices and providing for affirmative action to assure equal opportunity in employment. The College's obligation springs from the Civil Rights Act of 1964 (Title 42, Section

2000e, U. S. Code. (For Title VII of the Act, see plaintiff's exhibit 4.) The College's obligation also springs from Executive Order No. 11246 (30 Fed. Reg. 12319; plaintiff's exhibit 5).

6. Federal law likewise imposes on Reliance the duty to "take affirmative action to ensure that applicants are employed * * * without regard to their race, creed, color or national origin * * *" (See: Executive Order 11246.) An Executive Order has the force of statute. (*United States v. Local 189, United Papermakers & Paperworkers,* 282 F. Supp. 39.)

7. There was duly held a pre-award conference including low bidders, federal officials and others. Other meetings followed. The stress was on "commitment to a program of equal opportunity and merit employment practices." (Plaintiff's exhibit 17.) There was discussion of a so-called "manning table," with testimony that it had not been mentioned by name before the bidding. (For manning table, see plaintiff's exhibit 17, under VII, and plaintiff's exhibit 18, a form in use in June, 1968.)

8. The College tentatively accepted Reliance's bid on April 11, 1968 as will be more fully commented on in paragraph 23.

9. April 19, 1968, Reliance submitted an affirmative action plan to the College. Reliance made equality in hiring *subject to availability,* and dependent on referral of all labor from Pipefitters Local No. 120, an outfit which has some 1500 to 1600 white journeymen and 6 Negro apprentices.

10. It should be emphasized that the so-called manning table was just one of many documents submitted by Reliance to demonstrate Reliance's commendable interest in affirmative action plans. At this and subsequent times the plaintiff did not orally or in writing object to submitting a manning table.

11. April 25, 1968, Reliance was notified that its bid was rejected because the language used—"if available," negated the government's provision to assure non-discrimination against minorities, including Negroes. Several other efforts at agreement were fruitless. The city and fed-

eral authorities disapproved Reliance's bid, the College could not under the law accept it, so therefore rejected it, and on May 27, 1968 the College awarded the contract to Smylie Bros., Inc., the second lowest bidder, which company demonstrated to the government's agencies that it would satisfy the federal government's basic policy of non-discrimination as set forth in Executive Order No. 11246.

12. Turning now to the legal questions here to be answered, the court observes that the College does not contend that plaintiff could not bring a taxpayer's suit because Reliance, his company, would stand to benefit by the court's granting his prayer for an injunction. The law of Ohio is summed up in the article on Taxpayer's actions, 52 Ohio Jurisprudence 2d, Section 3. The court therefore holds that plaintiff has a right to bring this action.

13. The Civil Rights Act of 1964 (previously cited), deals with "Equal Employment Opportunities." Executive Order No. 11246 elaborates on and defines the rights and duties of parties affected by the Act. The order declares in Section 101:

"It is the policy of the Government of the United States to provide equal opportunity in Federal employment for all qualified persons, to prohibit discrimination in employment because of race, creed, color, or national origin, and to promote the full realization of equal employment opportunity through a positive, continuing program in each executive department and agency. The policy of equal opportunity applies to every aspect of Federal employment policy and practice."

14. This order has been in effect since October 24, 1965 and the plaintiff must have had due notice of it since then, although plaintiff alleged in argument that prior to the contract there was no evidence of what federal requirements were. Notably, however, such procedures were referred to and explained in the College's specifications.

15. In the College's bid specifications (Plaintiff's exhibit 1, 6404.3-S.S.G.C. 1) is found what is labeled "Special Supplement to the General Conditions—Executive Order

11246." This general reference alone puts Reliance on notice to look to Executive Order No. 11246 with all of its requirements to assure non-discrimination. The terms of this part of the College's specifications are clear and strong and they leave no doubt that, under federal overseeing, they had to be enforced to assure that equal employment opportunities guaranteed by Title VII of The Civil Rights Act of 1964 were observed.

16. Now the specifications also told the bidder, Reliance (plaintiff's exhibit 1, 6404.3-S.S.G.C. 2) that by its contractual obligation it "assumes whatever affirmative actions are necessary to assure equal employment opportunity in *all aspects* of employment, irrespective of race, color, creed or national origin." (Paragraph 1, above.) (Emphasis added.) In paragraph 2 it says: "To do this the contractor must have a *program* of affirmative action * * * tailored to the particular circumstances * * * which apply * * *." Later the specifications say: "The actions listed under these principles in the following pages are *furnished only as suggestions, and are not intended to limit the kinds of actions which may be taken.*" (Emphasis added.) In the paragraphs which follow in the specifications there are many suggestions of the bidder's duties.

17. Further, the College's specifications deal with the "Pre-award meeting and affirmative action plan." (Same reference to plaintiff's exhibit 1, page S.S.G.C.-3.) A time and place is set for such meeting. In D 2 (same reference) it says: "A written affirmative action plan by each such *apparent* low bidder must be approved by the federal government prior to the contract execution." (Emphasis added.) Purpose: to assure that "There is a minority group representation in all trades on the job and in all phases of the work."

18. The specifications of the College also call for an *unequivocal* statement by the contractor (here Reliance) assuring equal employment opportunity. (See: same, pages S.S.G.C.-4, 5, 6, 7, 8.)

19. The plaintiff has emphasized what it calls the College's abuse of discretion in rejecting the apparent lowest

bid because of Reliance's "refusal to submit a 'manning table' as part of the affirmative action plan required in the bid specifications." (Plaintiff's trial brief, page 5.) This, plaintiff says, was "unlawful" and "*a clear and gross abuse of discretion.*"

20. This and other passages in the amended petition and brief make it clear that plaintiff's theory is that the College violated the Civil Rights Act and other laws and is the culprit. Obviously the College's defense is that full blame for violating the law is on the plaintiff.

21. Now it well may be that the words "manning table" were first used in the pre-award conference as being a required inclusion in plaintiff's affirmative action plan. The testimony on this point differs. In the judgment of the court a manning table (plaintiff's exhibit 17, Section VII) is simply a list of the proposed total number of pipe-fitters for the College's job, listed by month and year, and showing the number of Negroes who would be on the job. It could just as well be called a "hiring list" or a "number of men on the job table." It comes close to being the "Periodic Progress Report" found in plaintiff's exhibit 1, 6404-3, S.S.G.C.-9, where employees are classified to show total numbers on the job and those in the "minority group." In the end, what material difference is there between the two tables?

22. In view of the matters discussed in paragraphs 13-21, the court is at a loss to understand the testimony of Reliance's Vice President to the effect that he was surprised when he first heard about the manning table requirement. This was April 4th, according to his testimony. He knew from the College's bid specifications that the pre-award meeting of apparent low bidders was necessary before the contract could be finally closed. He knew minority representation was discussed; he knew of the affirmative action program. In his brief (pg. 23), plaintiff states: "Defendants forced Reliance to 'negotiate matters *mentioned only vaguely* before bidding.'" The court construes this an admission by plaintiff that *before bidding* the manning table had been mentioned and was at least "vaguely" known to Reliance.

23. Reliance's bid was tentatively accepted by the College's trustees on April 11th (plaintiff's exhibit 16, page 61). This proviso accompanied the award:

"* * * provided, however, such award shall *not* be final until said Reliance Mechanical Contractors, Inc., is notified in writing by the Treasurer of the College District that the appropriate officials of the United States of America concur and approve the awarding and letting of the contract; * * *"

By his own testimony, therefore, Reliance's officer knew of the manning table a week before the conditional award of the contract. Above all, Reliance knew that its award of the contract was strictly conditioned on and subject to federal approval. Under all the circumstances, the court believes that Reliance was properly apprised of the manning table before the contract was fully cleared for acceptance, and had reason to know that the table was merely one means of helping assure Reliance's good faith. All bidders were treated with impartiality in the same way as Reliance.

24. The manning table cannot be lifted out of context. Neither can the pre-award meeting be overlooked. The full explanation given plaintiff in the specifications as to all phases of non-discrimination to be observed by the plaintiff makes it clear that it is *affirmative action* which is the central requirement. The manning table was merely one way of manifesting what affirmative action Reliance proposed; but it was vital when plaintiff put in it language that vitiated the rest of the plaintiff's plan. Plaintiff prepared an excellent affirmative action plan. It contains 14 separate sections and at least 100 pages. One of these contains the proposed manning table. The fly in the ointment came when plaintiff put these words over the columns:

"*Subject to availability and Referral to Reliance Mechanical Contractors, Inc., of Qualified Journeymen and Apprentices from Pipefitters Local No. 120.*" (Plaintiff's exhibit 17-VII).

25. That poisoned the very purpose of the Civil Rights Act of 1964, Title VII, "Equal Employment Opportunity." Later other forms of wording were tried, but were also re-

jected. Under the statutes the College was bound by the provisions of the law. Clearly the federal government was bound to enforce equal employment by the College. The College also had to follow the federal directive and reject Reliance's bid because Reliance had equivocated and tried to pass the buck to Pipefitters Local No. 120.

26. It is unfortunate that the College and Reliance are caught in the middle. However, when Reliance bid it knew the law and that it would have to obey the law. This knowledge came to it from the statute and Executive Order No. 11246 and from the College's specifications. The plaintiff cannot use the manning table as a serious excuse for believing that Reliance may deliberately flout the clear purpose of the law and get away with it. This might well bring down the whole structure of equal opportunity enforcement on this construction job. Central in this disputed point is not the manning table per se. It is the requirement that Reliance give assurance in positive form that it would abide by its affirmative action plan. It knew this before submitting its bid.

27. On pages 3-4 of the amended petition plaintiff alleges "that the sole basis for defendant's rejection, or threatened rejection of said lowest and best bid * * * was that the lowest and best bidder (Reliance) declined to provide such unlawful 'manning table' to defendants." This, in the court's view, is not sustained by the evidence. Reliance *did* furnish the manning table. But Reliance went beyond the law when it volunteered to include at the head of it the language found in paragraph 24 above. That was what nullified the enforcement provisions of the statutes.

28. The College's bid specifications and course of action to be followed after designating the lowest and best bidder were clear and concise. The College had to follow them. The court cannot find anything vague and indefinite about them. If Reliance did not choose to follow them, then, to escape the federal penalty, it cannot saddle them on the College by calling it the law violator.

29. Concerning *abuse of discretion* alleged as to the College, the court observes that Ohio courts are reluctant to disturb the exercise of discretion by a public board un-

less there is some evidence of unreasonable and completely unjustified action. (See quotation in *Alliance* v. *Joyce*, 49 Ohio St. 7, at 22.) Here the court cannot find evidence that the College did abuse its discretion in rejecting Reliance's bid. After all, the College did so in compliance with city and federal orders.

30. In the court's view, the plaintiff is trying to look two ways at the same time. His amended petition alleges that what the College has done (in not accepting Reliance's effort to avoid obedience to the requirements of the Civil Rights Act of 1964 and allied Executive Order No. 11246 as to non-discrimination) "amounts to a gross abuse of discretion *conferred upon them by statute * * *.*" (Emphasis added.) Here the plaintiff seems to strike directly at the constitutionality of the Civil Rights Act of 1964 and Order No. 11246. If one says that a statute confers the ability to commit a "gross abuse of discretion," must a person not conclude that that part of the statute is a nullity and must be put aside by a court of law? But later the plaintiff wraps the same law about him, proclaims that it is he who is defending it and in closing arguments admits that the situation does not reach the issue of unconstitutionality so far as federal law goes.

31. The court is satisfied that the Civil Rights Act of 1964, Title VII, is constitutional. The Act provides a remedy for a long-continued denial of vital rights of minorities and of every American—the right to equality before the law—the right in every walk of life in a land whose philosophy is that "all men are created equal," to an equal chance of employment in keeping with his ability. To assure obedience to the law is a duty inherent in the government. It may reasonably instruct its agencies how to proceed toward enforcement. There has, as the evidence here shows, come a time when firmness must be used against *all* who do not feel able or inclined to cooperate in the equal employment effort. The statute and the Executive Order implementing it are in the court's opinion in full keeping with the constitutional guarantees of the rights of all citizens.

32. In the court's judgment the evidence does not show

that the College set up any ratio between Caucasian and any minority group or that it required the low bidder to guarantee to maintain such thing—a ratio quota system. The plaintiff, under the circumstances, cannot so interpret the evidence and then accuse the College of "untrammeled discrimination." In pursuing this thought, plaintiff relies on Title VII of the Act, Order No. 11246, and Sections 153.59, 153.60 and 4112.02, Revised Code. The court believes that in this case the federal statutes amply protect both the plaintiff's and the College's rights and that it will serve no useful purpose to pursue further state law. The court recognizes that Ohio law as to equal employment is in full effect, that it does not deprive the plaintiff of any constitutional rights and is valid and binding.

33. Plaintiff has offered able and challenging arguments in support of his theory of the case. The court has reviewed these, but is not convinced that the College has violated the federal or state laws as plaintiff suggests. The court cannot consider it likely that the federal government, by its insistence that Reliance has not complied with the laws on equal employment opportunity, has deliberately brought down on the College's head such a debacle of illegality as plaintiff proposes. The plaintiff states nothing but his built-up conclusion of law and there is not a fact alleged, just a belief which in the court's view was not proven orally or in the many documents in evidence, all of which the court has reviewed.

34. In this case, the evidence fails to show that the College or any federal official has required "preferential treatment for any individual or any group for the purpose of achieving racial balance." (Congressional Record, April 8, 1964, page 6986.)

35. The court seriously questions the fact of "a waste of public funds" alleged in the petition. No oral or documentary evidence of this was offered. It could only be considered established by accepting plaintiff's theory of the case, *ipso facto*. As to "irreparable damage" to plaintiff and other taxpayers, no evidence was offered to prove the same. Plaintiff implies that such damage would have

to be assumed because Reliance, the lowest bidder monetarily (but not necessarily the "best"), lost the contract and *ipso facto* plaintiff and others suffered irreparable loss. The court cannot accept such an implication.

36. The plaintiff's amended petition does not rely on any conflict between Reliance's bargaining to hire men exclusively from a union, and its duty to abide by the equality of opportunity effort required of it under state or federal statutes. However he raises this point on page 16 *et seq.*, of his brief. The court is of the opinion, heretofore expressed, that Section 153.591, Revised Code, and the Executive Order of the Governor, dated June 5, 1967, do not violate the United States Constitution, Article VI, Clause 2, but rather support federal law. Reference is made to *Quarles* v. *Philip Morris, Inc.* (District Court of Virginia, 1968), 279 F. Supp. 505, and to *United States* v. *Local 109, United Papermakers and Paperworkers* (District Court of Louisiana, 1968), 282 F. Supp. 39. The latter case at pages 44-45 says:

"We cannot accept the Union's contention that such discrimination is not prohibited by Title VII [1964 Civil Rights Act] and that Title VII cannot be used in any way to alter or affect seniority systems. Where a seniority system has the effect of perpetrating discrimination, and concentrating or 'telescoping' the effect of past years of discrimination against Negro employees into the present placement of Negroes in an inferior position for promotion and other purposes, that present result is prohibited, and a seniority system which operates to produce that present result must be replaced with another system. We agree wholeheartedly with the conclusion in *Quarles* v. *Philip Morris, Inc.* (E. D. Va. 1968), 279 F. Supp. 505, that present discrimination cannot be justified under Title VII simply because Title VII refers to an effective date and because present discrimination is caused by conditions in the past. 'Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the act.' *Quarles, supra,* at 516." (Pages 44-45)

37. The court cannot interpret the law as exempting a contractor or labor union from the requirements of the Civil Rights Act of 1964 or its expanding Executive Orders, or from state statutes which fight discrimination, because they bargained, say, under the National Labor Relations Act, before the non-discrimination statutes were enacted. The purpose to assure equal employment opportunities is paramount.

In summary, the court holds that the College did not abuse its discretion. The bid specifications were sufficient, they set up definite standards, and were fair to all bidders. The rejection of Reliance's bid was legal and justified because of Reliance's refusal to comply with federal statutes compelling a positive assurance of equal employment opportunities. For the reason given the court dismisses plaintiff's prayer for a restraining order and renders judgment for the defendants.