John E. JOYCE, Jr., John E. Joyce, Inc., Building Contractors Association of New Jersey, Mechanical Contractors Association of New Jersey, Inc., National Electrical Contractors Association, New Jersey Chapter and Structural Steel and Ornamental Iron Association of New Jersey, Inc., Plaintiffs

v.

Joseph M. McCRANE, Treasurer, State of New Jersey and Donald A. Sullivan, Director, Division of Purchase & Property, Department of the Treasury, State of New Jersey, City of Newark, Defendants and Third-Party Plaintiffs,

v.

LOCAL NO. 3, BRICKLAYERS, MASONS, AND PLASTERERS INTERNATIONAL UNION OF AMERICA, et al., Third-Party Defendants.

Civ. A. No. 68-70.

United States District Court,
D. New Jersey.

Dec. 29, 1970.

Lindabury, McCormick & Estabrook, by Kenneth L. Estabrook, Elizabeth, N.J., for plaintiffs, John E. Joyce, Jr., John E. Joyce, Inc., and Mechanical Contractors Assn. of New Jersey, Inc.

Apruzzese & McDermott by Vincent J. Apruzzese, Springfield, N. J., for plaintiff, Building Contractors Assn. of New Jersey.

John J. Clancy, Newark, N. J., by Edward M. Callahan, Jr., Nutley, N. J., for plaintiff, National Electrical Contractors Assn., New Jersey Chapter.

Jardine & Morrice by Thomas V. Jardine, Newark, N. J., for plaintiff, Struc-

tural Steel and Ornamental Iron Assn. of New Jersey.

Carchman, Sochor & Carchman by Philip S. Carchman, Newark, N. J., for defendants and third-party plaintiffs, Joseph M. McCrane and Donald A. Sullivan.

William H. Walls by W. William Hodes, Newark, N. J., (Louisiana Bar), for defendant and third-party plaintiff, City of Newark.

Meth & Wood, by Theodore S. Meth, Newark, N. J., for third-party defendant, Essex County and Vicinity District Council of Carpenters and Millwrights of the United Brotherhood of Carpenters and Joiners of America AFL-CIO.

Parsonnet, Parsonnet & Duggan by Thomas L. Parsonnet, Newark, N. J., for third-party defendant, District Council No. 10; Essex County Building Trades Council; and Local No. 52, International Brotherhood of Electrical Contractors.

Bracken, Walsh & Craig by D. F. Moore Craig, Newark, N. J., for third-party defendant, Local 2212, Carpenters, Resilient Floorlaying Union, United Brotherhood of Carpenters and Joiners of America.

Nathan Duff, Perth Amboy, N. J., for third-party defendant, Local No. 11 The International Assn. of Bridge, Structural and Ornamental Iron Workers.

Dunn & Pykon by Anthony C. Meola, Newark, N. J., for third-party defendant, Asbestos Workers and Local No. 10, Sheet Metal Workers International Assn.

Cerefice & Cerefice by Louis R. Cerefice, Newark, N. J., for third-party defendant, Local No. 24, United Assn. of Journeymen Plumbers and Steamfitters of the United States and Canada.

Nolan & Lynes by Jerome M. Lynes, Newark, N. J., for third-party defendant, Local 475, United Assn. of Journeymen Plumbers and Steamfitters of the United States and Canada.

Frederick B. Lacey, U. S. Atty. by Raymond W. Young, Asst. U. S. Atty. Irwin Goldbloom, and Benjamin W. Mintz, Washington, D. C., for third-party defendants, Elliot L. Richardson, Secretary of Health, Education & Welfare, James D. Hodgson, Secretary of Labor, and George Romney, Secretary of Housing & Urban Development.

Nadine H. Taub, Newark, N. J., and Lowell Johnston, New York City, for third-party defendant, George Fontaine.

OPINION

CLARKSON S. FISHER, District Judge:

This action is brought to obtain judicial determination of the validity of the Affirmative Action Plan devised by the State of New Jersey in compliance with Executive Order #11246.

Motions for summary judgment pursuant to Fed.R.Civ.P. 56 are brought by third party defendants, the federal officials who have been made parties, the State of New Jersey, the City of Newark, and George Fontaine, a citizen of Newark. These motions are based upon constitutional and other grounds.

This controversy began in the Superior Court of New Jersey (Chancery Division), when John Joyce, Jr., John Joyce, Inc., and various contracting associations sought to enjoin Charles Sullivan, Director of the Division of Purchase and Property for the State of New Jersey from opening bids pertaining to the first stage of construction of the N. J. College of Medicine and Dentistry.

The cost of the construction was to be borne by the State of New Jersey with the aid of a grant from the United States. The Federal Government, through its Departments of Health, Education and Welfare, and Housing and Urban Renewal provided a grant of $35.5 million dollars for the project.

The first stage of construction was the power plant and the State of New Jersey advertised for bids which were to be opened on October 23, 1969. This date was then extended to November 26, 1969.

Since the project was to be partly funded by the United States, the State of New Jersey was required to comply

with Executive Order #11246 (1964). Under this Order all contractors and subcontractors on Federally financed projects were prohibited from discriminating in their employment practices on the basis of race, creed, color or national origin, and they were compelled to take affirmative action to see that all applicants and employees are treated equally as required by law. In order to comply with Executive Order #11246 and Executive Order #21 issued by the Governor of New Jersey in June, 1964, the State of New Jersey developed an Affirmative Action Plan and included it in the instructions to bidders published in May, 1969.

Upon the application to the N. J. Superior Court of the original plaintiffs, John Joyce, Jr., John Joyce, Inc., National Electrical Contractors Association, Building Contractors Association of New Jersey, Mechanical Contractors Association of New Jersey, and the New Jersey Chapter of the Structural Steel and Ornamental Iron of New Jersey, the original defendants, (Kervick and Sullivan), were restrained from opening bids on November 16, 1969.

Defendant McCrane has been substituted for defendant Kervick, having replaced him as Treasurer of the State of New Jersey. Defendant Charles Sullivan was succeeded by Edgar Meyers, who has since been succeeded by James A. O'Connor, the present Director of the Division of Purchase and Property for the State of New Jersey.

After obtaining the injunction, the plaintiffs amended their complaint in November, 1969, seeking a declaratory judgment to determine whether the contractors' associations and their members could by law comply with the instructions to bidders.

The defendants, McCrane and Sullivan, counterclaimed alleging the validity of the Affirmative Action Plan and brought a third party action naming as third party defendants: (1) labor unions having jurisdiction over the labor force in the Newark construction area, (2) federal officials concerned with the construction, and (3) George Fontaine, a representative of the community where the Medical College is to be constructed. On January 19, 1970 the federal third party defendants moved to have the matter transferred to this Court.

During March, 1970 the Office of Federal Contract Compliance held hearings in Newark to determine the status of minority groups in the construction trades in that area. As required, notice of these hearings was published in the Federal Register (35 F.R. 4231). Further, representatives of labor unions, contractors, government officials and members of the community were notified and invited to testify at the hearings. The hearings were held on March 18th and 20th with little or no participation by the labor unions.

Following these hearings the committee issued a report titled, "Report of the Panel on Equal Employment Opportunities in the Construction Trades in Newark, New Jersey, 1970". In that document the panel stated that it had found some unions guilty of exclusionary practices as to minorities and this had resulted in an underutilization of minorities in the construction trades in the Newark area.

Having committed $35.5 million dollars for this project and prompted by the findings of the Newark hearings, the Federal Government advised the State of New Jersey that to qualify for this grant the State had to develop another Affirmative Action Plan which would assure equal employment opportunity as required in Executive Order 11246, and also provide job opportunities for the residents of the area.

Pursuant to this the State of New Jersey on April 24, 1970 did submit to the U. S. Department of Health, Education and Welfare a revised Affirmative Action Plan, which plan is contained in N. J. Form #OAEC–5932, "Instructions to Bidders and General Contractors", found in the job specifications for the power plant of the Medical School.

On June 24, 1970 the Department of Health, Education and Welfare, through

Owen Kiely, Director of Contract Compliance Division, approved the revised plan of New Jersey as complying with Executive Order #11246 and the requirements of HEW for employment of the residents of the urban renewal area.

On August 19, 1970 this Court gave the State of New Jersey leave to advertise for bids for the construction of the Medical College provided that no bids be opened until the matter was resolved by the Court. The State of New Jersey has therefore advertised for bids, but all bids sought include the "Revised Affirmative Action Plan".

Under the revised plan, goals are set forth which each contractor must make a good faith effort to meet in utilizing minority journeymen in the performance of his contract. These goals range from 30–37% depending on the craft involved, and indicate the percentage of minority journeymen to be employed in relation to the entire work force in a specific trade. If the contractor fails to meet the goals, he is to be given an opportunity to prove his good faith effort. This effort will be reviewed and evaluated by a review council before any sanctions can be imposed.

Also included in the revised plan is a requirement that the contractor submit with his bid a statement signed by an official of a union with which he has referral arrangements or agreements covering workers to be employed on this project. This statement incorporates the unions in the affirmative action and provides that the unions admit to membership those minority journeymen desiring membership, who are qualified and satisfy the time limits for admission contained in the collective bargaining agreements and union by-laws. If, however, the union fails to sign such a statement, the contractor is in no way excused from his obligation to attempt to reach his goals.

After the plan was approved and bids solicited, the City of Newark on September 16, 1970, was granted leave to intervene as a defendant and a third party plaintiff.

On September 23, 1970 the defendants and third party plaintiffs (McCrane et al) filed notice of motion for summary judgment and dissolution of the retraints on the bids.

Shortly thereafter on September 25, 1970, the federal third party defendants also moved for summary judgment and dissolution of the restraints.

On October 1, 1970, George Fontaine filed a like notice of motion and on October 7, 1970 the City of Newark followed.

On November 30, 1970 the defendant Unions filed a motion for summary judgment claiming the "Union Statement" of the revised affirmative action plan is in violation of the National Labor Relations Act and further that the unions were not proper parties to the action.

Before this Court then is the disposition of these motions.

The revised plan was based on the findings made by the panel which conducted the hearings in April, 1970 in Newark, and these findings were based not only on testimony but also on figures supplied by both the United States and the State of New Jersey relating to population, unemployment rates, and labor force participation rates. On the basis of all this data, the panel concluded that some unions have failed to admit minorities to membership, failed to refer minorities for employment, and failed to admit minority group members into apprenticeship programs. A portion of the panel's report states:

"The skilled trades with the poorest representation of minorities is as follows:

*Electricians:* 18 of 1,130 journeymen, or 1.6%
11 of 211 apprentices of 5.2%

Total minority participation:
29 of 1,341, or 2.1%

*Plumbers, Pipefitters and Steamfitters:*

8 of 1,974 journeymen, or .4%
5 of 204 apprentices, or 2.5%

Total minority participation:
13 of 2,178 or .6%

*Roofers:* None of 247 journeymen
No apprentices

Total minority participation:
0 of 247

*Sheet Metal Workers:*

2 of 1,103 journeymen, or .2%
4 of 212 apprentices, or 1.9%

Total minority participation: 6 of 1,-
315, or .4%

*Iron Workers:* None of 546 journeymen
5 of 22 apprentices, or 22.7%

Total minority participation: 5 of
568, or .9%

*Carpenters:* 234 of 2,999 journeymen,
or 7.6%
12 of 149 apprentices, or 8%

Total minority participation:
246 of 3,148, or 7.6%

*Glaziers:* 2 of 165 journeymen, or
1.2%

No minority apprentices

Total minority participation:
2 of 166, or 1.2%"

(Page 3 of the Report)

The unions, and union associations urge that these findings are inaccurate, misleading, and in some instances untrue. To buttress their position, some have filed affidavits. They urge that summary judgment cannot be granted because a disputed factual situation exists.

The U. S. Court of Appeals, in the case of Great Lakes Screw Corp. v. NLRB, 409 F.2d 375 (7th Cir., 1969), held that conclusions of agencies are subject to judicial review and for that purpose the reviewing authorities must know the basis upon which the administrative conclusions rest.

Therefore, this Court called for and was furnished a copy of the transcript of the hearings held in Newark in April, 1970.

Once such a record is before this Court, the scope of review is limited. In National Labor Relations Board v. Hearst Publication, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), the Supreme

Court held that, "In reviewing the Board's ultimate conclusions, it is not the Court's function to substitute its own inferences of fact for the Board's, when the latter have support in the record."

This limited scope of review is still accepted as a valid rule of procedure. The findings of an administrative agency are conclusive on the Court if they are supported by substantial evidence. If, however, the findings are unsupported by substantial evidence or prejudicial error is found in the record, the agency will then be overruled. Braniff Airways, Inc. v. C. A. B., 126 U.S. App.D.C. 399, 379 F.2d 453 (1967).

The court is obligated to search the entire record to determine whether on the basis of all testimony and exhibits before the agency it could fairly and reasonably find as it did. Braniff v. C. A. B., *supra,* at p. 462.

If the agency came to a conclusion that was based on substantial evidence but not entirely correct, it will be permitted to stand. This is known as the harmless error principle and a court will not overturn an agency conclusion based on this as long as such error was not prejudicial. Braniff v. C. A. B., *supra,* at p. 465.

In the case of Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), the Supreme Court had to decide the validity of a Maryland plan which put a ceiling on allotments to welfare families. The Court said:

"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369. 'The problems of government are practical ones and may justify, if they do not require

rough accommodation—illogical, it may be, and unscientific.' Metropolis Theater Co. v. City of Chicago, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730."

In Borden Co. v. Freeman, 256 F.Supp. 592 (D.C. N.J.1966), affirmed 369 F.2d 404 (3rd Cir., 1967), the Court held that:

"When no such formal hearing is required, a federal agency which is in the process of making a rule or regulation need only follow the notice and informal hearing requirements of §§ 4(a) and 4(b) of the Procedure Act [5 U.S.C. § 1003(a), (b)]."

The hearings which were held in Newark were not only advertised in the Federal Register as required, but personal invitations to attend were sent out to many potentially interested parties, including the contractors and the labor unions.

The Court went on:

"Where an agency properly exercises its rule-making function and during the course thereof compiles a substantial record by means of documents and oral testimony, a trial de novo on the facts which were the basis for the rules adopted is not available to one contesting their validity."

This Court has been furnished with a 579 page transcript of the hearings in Newark and numerous exhibits and statistical fact sheets which tend to support the ultimate conclusions of the panel.

Again quoting the *Borden* case:

"In reviewing the record, it is, of course, not the province of the court to substitute its judgment for that of the administrative agency authorized by Congress to exercise rule-making functions in areas where that agency possesses a unique expertise."

The Office of Federal Contract Compliance possesses sufficient expertise and experience to be able to assimilate raw statistical data and draw conclusions which are both rational and reasonable.

■ Therefore if the findings have a reasonable basis, it is not for this Court to resift and re-evaluate the testimony and many statistics and documents upon which the findings rest. Some of the parties here deny discrimination by the unions involved and they allege that this creates a fact issue. It should be pointed out that the Affirmative Action Plan states that some unions have been using discriminatory practices. An examination of the record discloses that all of them have not, but even some discrimination is too much discrimination. At any rate, it does not create an issue of fact. See Porcelli v. Titus, 431 F.2d 1254 (3rd Cir., Sept. 23, 1970). Therefore all issues here are ready for disposition by summary judgment.

It has been urged that the Revised Affirmative Action Plan is in violation of the Constitutions of the United States and the State of New Jersey and the Civil Rights Act of 1964.

The Plan here under attack is the State's implementation of Executive Order No. 11246 (Federal), and Executive Order No. 21 (State). These Orders required affirmative action to insure the sweeping away of *any* discrimination in contracts involving public funds.

■ The validity of the Executive Orders cannot be assailed. They have the force and effect of law. Farmer v. Philadelphia Electric Co., 329 F.2d 3 (3rd Cir., 1964); Farkas v. Texas Instrument Co., Inc., 375 F.2d 629 (5th Cir., 1967); Local 189, United Paperworkers v. United States, 416 F.2d 980 (5th Cir., 1969), aff'g United States v. Local 189, United Paperworkers, 282 F.Supp. 39, (E.D.La., 1968)

The fundamental principle underlying the Presidential power to require non-discrimination by contractors is found in the power of the Federal Government to set conditions upon which anyone desiring to do business with the United States must meet. Perkins v. Lukens Steel, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108

(1940); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 91 L.Ed.1118 (1969).

■ As was held in Contractors Association of Eastern Penn. v. Secretary of Labor, 311 F.Supp. 1002 (E.D. Pa., 1970) the Civil Rights Act and Executive Order No. 11246 have a common objective and are in no way conflicting. This Court is in complete agreement with the *Contractors* case and Weiner v. Cuyahoga Community College District, 15 Ohio Misc. 289, 238 N.E.2d 839, aff'd 19 Ohio St.2d 35, 249 N.E.2d 907 cert. denied 396 U.S. 1004, 90 S.Ct. 554, 24 L.Ed.2d 495 (1970).

As was pointed out by Judge Weiner in the *Contractors* case, civil rights have little reality absent economic rights.

■ Throughout this case the objectors to the implementing plan insist that it sets up "quotas" and is therefore invalid; however, the Plan merely sets up goals for minority employment. Sanctions cannot be imposed under the Plan if the contractors strive to meet these goals and fall short. If good faith is present, no sanctions can be applied, and if necessary a contractor may insist on a hearing as to non-compliance, which hearing is of course subject to judicial review.

■ The defendant unions' position that they are not proper parties to this action has no merit. The unions here involved are for the most part responsible for supplying to the contractors the qualified personnel needed for the Medical School project; therefore, in any matter that deals with the regulation of this work force the unions must be proper parties. To rule otherwise would defeat the intention of Executive Order No. 11246, in that the Government could bind the contractors to affirmative action yet this would be meaningless as the contractors could contract away this obligation through collective bargaining agreements with the unions. In order to enforce affirmative action then, the unions as the controllers of the work force are proper parties.

■■ The next argument urged by the labor unions appears to center around the proposition that, absent any evidence of discrimination, a union is free to pick and choose its members as it sees fit. The proposition has been upheld by the courts as was the case in Moynahan v. Pari Mutuel Employees Guild, 317 F.2d 209 (9th Cir., 1963), Cert. denied 375 U.S. 911, 84 S.Ct. 207, 11 L.Ed.2d 150 (1963). The court, as part of its decision, stated that the Labor Management Reporting and Disclosure Act (L.M.R.D.A.) was not designed to deny unions control of their membership. This doctrine was expanded further in Stone v. Local 29, Intern. Broth. of Boilermakers et al., 262 F.Supp. 961 (D.C. Mass, 1967) wherein the court said that "there is no legal requirement upon a Union to accept a person for membership solely because he is qualified to become a member."

The position taken by the unions, therefore, is that under the L.M.R. D.A. a union is free to exercise discretionary control as to choosing its members. This is a valid statement, however, it presupposes that there is no evidence of any discrimination. The Findings in the Affirmative Action Plan, however, are quite the contrary and in fact indicate that some labor unions have been guilty of abusing this discretionary membership control that the law has allowed.

Section 157 of the National Labor Relations Act guarantees to all employees the right to form or join a labor union and through this union to bargain collectively with their employer. The Act goes further in Section 158(a) (3) and states that it is an unfair labor practice for an employer to encourage or discourage union membership by discriminating between union and non-union employees in regard to hire or tenure of employment.

Section 158(a) (3) of the National Labor Relations Act has been construed by the courts to mean that it is not an unfair labor practice to hire exclusive-

ly through a hiring hall nor is it an unfair labor practice to hire only those men referred to the employer by the union hiring hall, but it is a violation of this Section for an employer to use such a referral system which in fact discriminates in referring union and nonunon workers, Nat'l Labor Relations Board v. Bechtel Corp., 328 F.2d 28 (10th Cir., 1964). In other words a hiring hall must refer all those qualified workers who report to it without discriminating between its members and those who are non-members. The hiring must be done without any reference to union membership, by-laws, rules, regulations or constitutional provisions. The U. S. Supreme Court in Local 357, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen v. National Labor Relations Board, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961) realized that the hiring hall was necessary so that an employer would know exactly where to go if he needed a certain craftsman or worker. The hiring hall was the focal point of employment and as such was the only method of obtaining work by qualified personnel. The Court, however, went on to say that such employment referral must be done on an equal basis between all qualified men who show up for referral and union members are not entitled to preferential treatment.

Thus the matter before this Court does not concern the validity of the unions' collective bargaining agreements nor their hiring halls, but it does center around the fact that some unions have discriminated, not between union and non-union workers, but between white and non-white workers. This conclusion is borne out by the statistics which accompany the Findings in the Plan.

The mandatory union membership clause against which the unions have so vigorously argued is found on pages 4–5 of Part VI of the Supplemental General Conditions Relating to Affirmative Action for Equal Employment Opportunity at the N. J. College of Medicine and Dentistry, Newark, New Jersey, and is as follows:

"When the contractor has a referral agreement or arrangements with a union covering workers to be employed on this project, he shall submit with his bid a statement similar to Appendix B, signed by an authorized union official, in which the union agrees as follows: * * *

3. Minority group journeymen employed by the contractor shall be admitted to union membership within the time limits contained in the applicable collective bargaining agreements, union constitution and by-laws."

Counsel for the unions have argued that this provision is a usurpation of their right to choose their own members. This would be a strong argument had it not been for the discriminatory practices of some of the unions in the past. In order to have an integrated labor force now and in the future the Governments of the United States and the State of New Jersey have seen fit to have membership in the unions available to those minority journeymen hired for the Medical School project and who satisfy the time limits for membership contained in the applicable agreements and by-laws. Union membership is not forced on those minority journeymen on the job, it is however, made available to them, a situation which the past has shown to be rare indeed.

The unions are quick to counter with the proposition that the courts cannot tamper with the union membership roles. This, of course, is not a valid asumption for the courts have not hesitated in the face of racial discrimination to take affirmative action by means of injunction to see that there is a racial balance in the construction work force. See United States v. United Assoc. of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry, Local No. 73, 314 F.Supp. 160 (S.D.Ind., 1969); United States v. Local 86, Intern. Association of Bridge, etc., 315 F.Supp. 1202 (W.D. Wash., 1970); and United States v. Sheet Metal Workers International Assoc., Local No. 36 AFL–CIO, 416 F.2d 123 (8th Cir., 1969).

In light of these decisions this Court finds little difficulty in approving the Revised Affirmative Action Plan. If in the above cases it was within the power of the courts to order integration in union membership by devising their own affirmative action plans, it is then within the province of this Court to approve an Affirmative Action Plan designed for the same purpose.

Therefore the motions for summary judgment of the defendants and third party plaintiffs, (McCrane et al); the Federal third party defendants, (James D. Hodgson, Secretary, U. S. Dept. of Labor, George Romney, Secretary, U. S. Dept. of Urban Affairs, and Elliot Richardson, Secretary, U. S. Dept. of Health, Education and Welfare); George Fontaine; and the City of Newark, for approval of the Revised Affirmative Action Plan and dissolution of the restraints on the bids are hereby granted. All other motions, including motions for summary judgment by third party defendant unions, and motions addressed to interrogatories are denied.

Orders conforming to the above to be submitted by the appropriate moving parties.