UNITED BUILDING AND CONSTRUCTION TRADES COUNCIL OF CAMDEN COUNTY AND VICINITY, APPELLANT, v. MAYOR AND COUNCIL OF THE CITY OF CAMDEN AND THE DEPARTMENT OF THE TREASURY OF THE STATE OF NEW JERSEY, RESPONDENTS.

Argued December 15, 1981—Decided February 18, 1982.

318

*Steven K. Kudatzky* argued the cause for appellant (*Tomar, Parks, Seliger, Simonoff & Adourian*, attorneys).

*Laurence E. Rosoff*, City Attorney, argued the cause for respondent Mayor and Council of City of Camden.

*Joseph L. Yannotti*, Deputy Attorney General, argued the cause for respondent Department of Treasury of State of New Jersey (*James R. Zazzali*, Attorney General of New Jersey, attorney; *Andrea M. Silkowitz*, Deputy Attorney General, of counsel).

The opinion of the Court was delivered by

PASHMAN, J.

This appeal of an administrative agency decision implicates the constitutional powers of both state and local government. At issue are two provisions of an ordinance enacted in 1980 by the City of Camden mandating affirmative action by private construction companies awarded public works contracts by the city government. Both provisions enact goals that exceed the minimum requirements in the State Treasurer's affirmative action rules, *R.* 1977, *d.* 364, *N.J.A.C.* 17:27–1.1 to 13.2, promulgated pursuant to the amendments to the Law Against Discrimination concerning affirmative action in public works contracting, *L.*1975, *c.* 127, *N.J.S.A.* 10:5–31 to 38.

The first provision establishes a 25% minority [1] hiring goal for contracts with the City of Camden, which is more rigorous than

---

[1]"Minority worker" for purposes of both the Camden ordinance and the State Treasurer's minority hiring guidelines includes the same persons. The Camden ordinance defines "minority" to include persons who are Black, Hispanic, Asians, American Indians or women. The Treasury Department rules define "minority worker" to include persons who are Black or Spanish-American, Asian or American Indian. *N.J.A.C.* 17:27–2.1. However, for purposes of the Department's minority hiring goals, "minority" also includes females. Thus, although females are not a numerical minority in this State, throughout the opinion "minority" includes women, unless otherwise indicated.

the 20% goal set by the State Treasurer for all other public works contracts in Camden County. The second provision requires that 40% of the labor force in Camden City public works projects be city residents. The State Treasurer had set no residency quotas or goals. Appellant United Building and Construction Trades Council of Camden County and Vicinity (Council), an association of labor organizations, challenges State approval of the Camden program as both unauthorized under the Law Against Discrimination, *N.J.S.A.* 10:5–1 to 38, and unconstitutional. The Court now holds that approval of these provisions by the State Treasurer was proper under the statute. We also hold that neither provision violates the United States or New Jersey Constitution, and that the resident hiring quota is not preempted by state statute.

## I

The 1975 amendments to the Law Against Discrimination, mandating affirmative action in public works contracting, *L. 1975, c. 127, N.J.S.A.* 10:5–31 to 38, are typical of state and federal statutes that seek to use the government's purchasing power to promote equal opportunity in the construction trades. *See generally* Public Works Employment Act of 1977, 91 *Stat.* 116, 42 *U.S.C.* § 6701 *et seq.; Fullilove v. Klutznick*, 448 *U.S.* 448, 473, 100 *S.Ct.* 2758, 2772, 65 *L.Ed.*2d 902, 921 (1980) (upholding federal affirmative action quotas for minority contractors). Under the act, state and local governments, in their roles as marketplace participants, require the contractors they hire to make efforts to employ more minority workers.

The affirmative action provisions do not directly affect contracts between private parties. The minority hiring goals pertain only to contracts with the State, its political subdivisions, and agencies or authorities created by state and local government. *N.J.S.A.* 10:5–32. In enacting the affirmative action amendments to the Law Against Discrimination, the Legislature

chose to delegate the responsibility for promulgating specific hiring goals. The statute provides that *no public works contract monies shall be paid to any contractor, subcontractor or firm that has not guaranteed compliance with an affirmative action program approved by the State Treasurer.* *N.J.S.A.* 10:5–32. To this end, the statute empowers the State Treasurer

a. To investigate and determine the percentage of population of minority groups in the State or areas thereof from which the work force for public works contracts is or may be drawn;

b. To establish and promulgate such percentages as guidelines in determining the adequacy of affirmative action programs submitted for approval pursuant to section 2 of this act . . . [*N.J.S.A.* 10:5–36 (footnote omitted)]

The State Treasurer has discretion to promulgate specific affirmative action requirements as long as they are based on "the percentage of population of minority groups in the State or areas thereof," *N.J.S.A.* 10:5–36(a).

Pursuant to his statutory mandate, the State Treasurer promulgated comprehensive affirmative action rules in September 1977. *R.* 1977, *d.* 364, *N.J.A.C.* 17:27–1.1 to 13.2, which included "employment goals" for the hiring of minorities in each of New Jersey's 21 counties. *N.J.A.C.* 17:27–7.3. In light of the State Treasurer's power "[t]o require all State and local agencies awarding public works contracts to submit for approval their affirmative action programs," *N.J.S.A.* 10:5–36(c), the rules further provided for approval of any local affirmative action program that conforms to the statutory and administrative requirements, and "establishes an employment goal which is *not lower than* the applicable goal established by [*N.J.A.C.* 17:27–7.3]." *N.J.A.C.* 17:27–6.5 (emphasis added).

After the State Treasurer promulgated the 1977 affirmative action rules, a group of Camden citizens approached city officials to inquire about the enactment of an affirmative action program for city public works contracts. The mayor appointed Camden City attorney, Louis A. Vargas, to head a task force of

city residents. By May 1980, a proposed affirmative action ordinance had been drafted.[2]

On July 24, 1980 the Camden City council adopted "an ordinance to establish an affirmative action program in connection with construction contracts to be performed for or on behalf of the City of Camden." The ordinance noted that according to 1977 U.S. Labor Department statistics, the unemployment rate for Camden was 11.5%, compared with 8.1% state-wide and 7.6% county-wide. Unemployment among Black Americans in the city was 18.4%, and among Hispanic Americans 15.6%. The ordinance noted further that unemployment in Camden had increased significantly since release of the Labor Department statistics.

The ordinance applied to all contracts with the City of Camden involving more than $50,000. It provided that every public works contractor

> ... shall make every effort to employ not less than 25% minority workers in the utilization of all trades, as tradesmen, journeymen and apprentices, in performance of his/her contract, whether or not the work is subcontracted.

The ordinance defined "minority" and listed several criteria for measuring good faith compliance.

Camden's affirmative action program was amended by a second ordinance, adopted on August 28, 1980. This second ordinance provided, in addition to the minority hiring goal, that public works contractors "shall make every effort to employ persons residing within the City of Camden *but in no event shall less than 40% of the entire labor force be residents of the City of Camden.*" [Emphasis added.]

---

[2]On May 8, 1980, Vargas sent a copy of the proposed ordinance to the Chief Affirmative Action Officer, Carl G. Briscoe, in the Department of Treasury for review and comment. On May 19, 1980, Briscoe responded to the Camden City attorney's inquiry. Briscoe listed several provisions—not relevant to this appeal—that the Camden ordinance required in order to meet minimum state requirements and receive state approval.

Both the July 24 ordinance and the August 28 amendatory ordinance were submitted on November 14, 1980 to Chief Affirmative Action Officer Briscoe for his approval. On November 24, 1980 Briscoe informed the city that the affirmative action program met minimum state requirements [3] and was approved by the State for the period November 24, 1980 through November 24, 1981.[4] Appellant now challenges this approval of the Camden affirmative action program by the Chief Affirmative Action Officer.

The Council did not participate in the procedure through which the Chief Affirmative Action Officer approved the Camden program. Because the Camden program met all the minimum requirements for state-approved plans, its approval by the Chief Affirmative Action Officer presumably was assured pursuant to *N.J.A.C.* 17:27–6.5. On December 17, 1980 the Council filed a Notice of Appeal with the Appellate Division, pursuant to *R.* 2:2–3, challenging the final determination of the Chief Affirmative Action Officer in approving the Camden plan.

On June 19, 1981 we directly certified the appeal to this Court to decide all issues in the case.

## II

A. *The Department of Treasury's Statutory Authority to Approve the Camden Ordinance.*

Appellant does not contend that the Chief Affirmative Action Officer has no statutory authority to approve local affirmative action plans. The 1975 amendments specifically give the Treasurer the power "[t]o require all State and local agencies award-

---

[3] Briscoe reminded the city that since its program applied only to contracts involving more than $50,000, state guidelines would apply to contracts covered by the Department rules and involving payment of less than $50,000.

[4] On November 25, 1981, the Camden program was given provisional approval through January 1982. The city was asked to adopt certain procedures not relevant to this appeal.

ing public works contracts to submit for approval their affirmative action programs." *N.J.S.A.* 10:5–36(c). Such a provision is superfluous if local government has no authority to promulgate plans that differ in some respects from the State Treasurer's guidelines. The Court presumes that the Legislature does not enact meaningless legislation. *McGlynn v. New Jersey Public Broadcasting Auth.*, 88 *N.J.* 112 (1981); 2A Sutherland, *Statutory Construction* (4th ed. 1973) § 46.06.

The Council focuses instead upon the specific decision of the Chief Affirmative Action Officer in approving the Camden ordinance. The Council first contends that although the State Treasurer is empowered to approve local affirmative action programs, the Law Against Discrimination provides no authority for approving local hiring goals more rigorous than the applicable county-wide goal. Neither, according to the Council, does the statute provide authority for establishing any resident hiring quotas at all. The Council also contends that even if the State Treasurer can approve local minority hiring goals, the Department abused its discretion by approving Camden's more rigorous goal without any showing of necessity.

The standard of review applied to the State Treasurer's decision to approve the Camden minority hiring goal and resident quota is no different than the standard used to review any other final agency decision. As stated in *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 561 (1978),

"[a]dministrative rules and regulations have in their support the rebuttable presumption of validity if they come within the ambit of delegated authority," and . . . . unless such regulations are "clearly *ultra vires* on their face, the party contesting them has the burden of proving their invalidity." [quoting *In re Regulation F–22, Office of Milk Industry,* 32 *N.J.* 258, 261–62 (1960).]

As a result of this "rebuttable presumption of validity, . . . an *ultra vires* finding is disfavored." *Id.* The grant of authority to an administrative agency is to be liberally construed to enable the agency to accomplish the Legislature's goals. The agency has "such implied incidental powers as may reasonably be adapted to that end." *In re Suspension of Heller,* 73 *N.J.* 292, 303 (1977).

■ In this case, the scope of the State Treasurer's delegated authority is clear. The relevant law is an amendment to the Law Against Discrimination. It bars public works contractors from discriminating on the basis of "age, race, creed, color, national origin, ancestry, marital status or sex." *N.J.S.A.* 10:5–33. At the same time, the statute mandates affirmative action in public contracting by outlawing public works contracts with any party "which has not agreed and guaranteed to afford equal opportunity in performance of the contract in accordance with an affirmative action program approved by the State Treasurer." *N.J.S.A.* 10:5–32. To this end, the State Treasurer is empowered to determine percentages of minority populations across the State, *N.J.S.A.* 10:5–36(a), and establish those populations as guidelines in determining the adequacy of affirmative action programs. *N.J.S.A.* 10:5–36(b). Unless the Chief Affirmative Action Officer's decision works "to alter the terms of [the] legislative enactment or frustrate the policy embodied in the statute," *N. J. Chamber of Commerce v. N. J. Elec. Law Enforce. Comm'n*, 82 *N.J.* 57, 82 (1980), by impeding or acting arbitrarily with regard to promotion of equal opportunity in public works contracting through affirmative action, the decision will be affirmed.

1. *The 25% minority hiring goal.*

The State Treasurer's affirmative action rules include "employment goals" for the hiring of minorities in each of New Jersey's 21 counties. These goals range from a low of 10% in seven counties to a high of 32% in Essex County, reflecting the differing minority populations in each area. The goals are clearly not equivalent to the minority populations in each county, since "minority workers" includes women, who we assume represent about 50% of the population in each county. The Camden County goal is 20%. The goal enacted by the City and approved by the State Treasurer is 25%.

The State Treasurer's affirmative action rules also impose duties on contractors to undertake a good faith effort to comply

with the minority hiring goal if the contractor fails to meet the minority hiring guidelines. *N.J.A.C.* 17:27–7.4. These duties range from seeking assurances of cooperation from unions to notifying minority referral organizations of hiring needs to notifying particular minority workers who are listed with the contractor as awaiting employment. *N.J.A.C.* 17:27–7.4(1), (2)(a)(b).

The amendments to the Law Against Discrimination, *N.J.S.A.* 10:5–31 to 38, say nothing about the specific geographical areas upon which minority hiring goals should be based. The statute does not mandate the use of county-wide hiring goals, as opposed to regional or local goals. The statute instead gives the State Treasurer broad authority "[t]o investigate and determine the percentage or population of minority groups *in the State or areas thereof* from which the work force for public works contracts is or may be drawn." *N.J.S.A.* 10:5–36(a) (emphasis added). The provision clearly is intended to give the State Treasurer flexibility in establishing goals.

The State Treasurer has decided to establish county-wide goals, reflecting the different minority populations in the State's 21 counties. The use of county-wide hiring goals, however, does not preclude the adoption of different hiring goals within any county, particularly where the minority population varies significantly within different parts of that county.

■ This is precisely the situation that currently exists in the City of Camden within Camden County. Official 1980 U.S. Census Bureau statistics reveal a marked difference between the minority populations of the two areas. For example, the black population represents 53.0% of Camden City, versus 14.3% of Camden County. Further, 19.2% of Camden City residents identify themselves as being of Hispanic origin.[5] Assuming that

---

[5]The 1980 U. S. Census Bureau statistics for the City of Camden show the following racial populations:

about half the city population is female, we can conclude that at least 75% of Camden City residents, and perhaps as many as 90% of city residents, are "minority" workers for purposes of the Camden minority hiring goal. To require that persons contracting with the city make good faith efforts [6] to hire 25% "minority" workers cannot seriously be said to "adversely affect the legislative scheme ... [or] stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the Legislature." *Fair Lawn Ed. Ass'n v. Fair Lawn Bd. of Ed.,* 79 *N.J.* 574, 586–87 (1979) (citations omitted). To the contrary, we would question the fairness of any hiring practices that under such circumstances resulted in construction work forces with substantially fewer than 25% minority workers. The State Treasurer's approval of the 25% minority hiring goal for public works contracts with Camden City is therefore neither *ultra vires* nor an abuse of agency authority under the Law Against Discrimination.

2. *The Camden resident quota.*

The Council argues that approval of Camden's residency quota requiring 40% of all public works contract employees to be city residents is *ultra vires* because the enabling legislation does not contemplate any residency requirement. The Council notes the

| | |
|---|---|
| Total population | 84,910 |
| Caucasian | 25,739 |
| Black | 45,008 |
| American Indian/Eskimo | 193 |
| Asian/Pacific Islands | 278 |
| Other | 13,692 |

A total of 16,308 city residents identified themselves as of Hispanic origin. It is not known how these persons identified themselves for purposes of the above racial classification.

[6]Although the city's ordinance speaks in terms of making "every effort" to meet the minority hiring goals, as opposed to the State Treasurer's requirement of a "good faith" effort, the Camden ordinance speaks of "criteria for measuring good faith," and the additional criteria it requires to establish that compliance are minimal.

comprehensive criteria upon which the contractor may not discriminate, including "age, race, creed, color, national origin, ancestry, marital status or sex." *N.J.S.A.* 10:5–33(a). It concludes that since this list excludes residency, the Treasury Department has no authority to approve any affirmative action plan including a residency requirement.

■ Local affirmative action programs doubtless contain many requirements that were not contemplated by the legislators who drafted the affirmative action law or the administrators who promulgated affirmative action rules. Such requirements may be authorized by the implied power of the localities under the Law Against Discrimination, *see New Jersey Guild of Hearing Aid Dispensers v. Long, supra,* 75 *N.J.* at 571, or by the general police power. They may or may not be constitutional or precluded by state statute. Clearly, State Treasurer approval of a local affirmative action plan pursuant to the Law Against Discrimination does not immunize the plan against constitutional and statutory attack. But as long as the local plan meets the minimum state requirements, *N.J.A.C.* 17:27–6.5, and does not frustrate the statutory goals of affirmative action, *N.J.S.A.* 10:5–32, and equal opportunity, *N.J.S.A.* 10:5–33, in public works contracting, State Treasurer approval of a local plan including such a provision is not *ultra vires* or an abuse of discretion.

■ If the minority population of the City of Camden were less than that of the surrounding area, a resident hiring quota might impede the hiring of additional minority workers. The ordinance might then be found to "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the Legislature." *Fair Lawn Ed. Ass'n, supra.* But to the contrary, Camden has a higher percentage of minority population than other areas of the county. As a consequence, a duty to hire Camden residents could only increase the likelihood that any contractor will meet the State Treasurer's minority hiring goals. We therefore hold that the State Treasurer did not act outside the scope of his statutory authority under the

Law Against Discrimination in approving the Camden ordinance.

We next address constitutional and statutory challenges to the affirmative action and resident hiring goals in the ordinance.

B.  *Constitutionality of affirmative action hiring goals.*

█  In its brief, the Council states that it does not challenge the constitutionality of either the relevant amendments to the Law Against Discrimination, *N.J.S.A.* 10:5–31 to 38, or the State Treasurer's affirmative action rules, *N.J.A.C.* 17:27–1.1 to 13.2. However, for purposes of constitutional analysis there is no distinction between a challenge to the particular minority hiring goal established for the City of Camden and a challenge to the State Treasurer's minority hiring goals in general. No argument can be made that approval of a 25% minority hiring goal for the City of Camden was arbitrary administrative agency action or action that in any other way violated appellant's constitutional due process rights. Moreover, even if we assume that municipalities have less authority than the State to legislate in affirmative action matters, a proposition we expressly decline to address, the assumption would have no relevance in this appeal. By approving the Camden plan, the State Treasurer has established a minority hiring goal for the City of Camden that operates no differently than every other minority hiring goal established by the State Treasurer pursuant to *N.J.S.A.* 10:5–36. The Council's constitutional challenge to the Camden minority hiring goal must therefore be interpreted as a challenge to the State Treasurer's general power to issue affirmative action hiring goals. *N.J.A.C.* 17:27–7.3.

We begin with the premise that the Camden minority hiring goal, like the 21 county-wide hiring goals promulgated by the State Treasurer, *N.J.A.C.* 17:27–7.3, is not a fixed quota. The ordinance does not mandate that the contractor hire 25% minority workers, but only that the contractor "make every effort to meet the [goal]." Appellant's contrary reading of the ordinance

is not correct.[7] The ordinance's criteria for good faith compliance confirm that the hiring goals are not immutable quotas. At oral argument, the Department of Treasury made clear that it regarded the ordinance as establishing goals, not quotas. The Camden city attorney expressed no contrary opinion.

There is substantial precedent for mandating affirmative action by recipients of government contracts. The minority hiring goals in this case are less stringent than the State of New Jersey requirements for affirmative action in public contracting approved 11 years ago by a Federal District Court in *Joyce v. McCrane,* 320 *F.Supp.* 1284 (D.N.J.1970). *Joyce* upheld the "Newark Plan," an affirmative action program promulgated by the State Treasurer pursuant to Federal Executive Order No. 11246 (1965) and New Jersey Executive Order No. 21 (1965). Executive Order No. 11246 required all contractors and subcontractors in federally financed projects to take affirmative action to see that applicants were not discriminated against on the basis of race, creed, color or national origin. In order to receive federal funds for a state medical school construction project, the State Treasurer promulgated an affirmative action plan setting up goals of 30% to 37% hiring of minority journeymen. As in this case, contractors faced no absolute quotas but faced sanctions if they failed to make a good faith effort at compliance. Judge Fisher approved of the Newark plan, expressly noting that hiring goals and not quotas were at issue.

---

[7] In arguing that the Camden ordinance establishes an unconstitutional quota, appellant points to language in the ordinance that although the hiring goals pertain to "every union/workman level," "in no event may the total man-hours worked" by minority members be less than the annual goals. We interpret this language to mean that although the contractor should attempt to hire at least 25% minority workers for each type of job involved in the project, in no event shall the *total* workforce be less than 25% minority workers, unless the contractor has been unable to meet the 25% goal after satisfying all criteria for good faith compliance. Any other interpretation would render superfluous the ordinance's repeated references to hiring "goals" and the criteria for measuring "good faith" compliance.

332

[T]he objectors to the implementing plan insist that it sets up "quotas" and is therefore invalid; however, the Plan merely sets up goals for minority employment. Sanctions cannot be imposed under the Plan if the contractors strive to meet these goals and fall short. [320 *F.Supp.* at 1291]

Similar hiring requirements placed upon public works contractors have been upheld by federal courts in cases which the Supreme Court declined to review. *See, e.g., Contractors Ass'n of Eastern Pa. v. Secretary of Labor*, 442 *F.*2d 159 (3rd Cir.), *cert.* den., 404 *U.S.* 854, 92 *S.Ct.* 98, 30 *L.Ed.*2d 95 (1971) (upholding the "Philadelphia Plan," requiring "every good faith effort" to meet hiring goals in six construction industry trades); *Associated Gen. Contractors of Mass., Inc. v. Altshuler*, 490 *F.*2d 9 (1st Cir. 1973), *cert.* den., 416 *U.S.* 957, 94 *S.Ct.* 1971, 40 *L.Ed.* 2d 307 (1974) (upholding the "Boston Plan" which required "a not less than twenty percent ratio of minority employee man hours to total employee man hours").

The above-mentioned affirmative action plans differ from the State Treasurer's plan in that they were promulgated pursuant to federal mandate, specifically the Civil Rights Act of 1964 and Executive Order 11246. Here the State Treasurer has acted pursuant to state legislation. *N.J.S.A.* 10:5–31 to 38. However, the states have no less constitutional authority than the federal government to remedy identified past discrimination. "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo*, 424 *U.S.* 1, 93, 96 *S.Ct.* 612, 670, 46 *L.Ed.*2d 659, 730 (1976). The discussion in *University of California Regents v. Bakke*, 438 *U.S.* 265, 98 *S.Ct.* 2733, 57 *L.Ed.*2d 750 (1978), draws interchangeably from precedent involving Fourteenth Amendment challenges to state enactments and Fifth Amendment challenges to federal measures. *Compare Bakke, supra*, 438 *U.S.* at 291–310, 98 *S.Ct.* at 2748–2758, 57 *L.Ed.*2d at 771–84 (Fourteenth Amendment challenge to state medical school admissions program), *with Fullilove v. Klutznick*, 448 *U.S.* 448, 480–89, 100 *S.Ct.* 2758, 2775–2780, 65 *L.Ed.*2d 902, 925–31 (1980) (Fifth Amendment challenge to Public Works Employment Act of 1977).

*Fullilove v. Klutznick, supra,* should lay to rest any doubts about the validity under the United States Constitution of state-imposed affirmative action requirements. In *Fullilove,* the United States Supreme Court approved the use of racial quotas as a remedy for past discrimination in general. The Court held that the remedy of affirmative action quotas need not be limited to cases of discrimination by a particular employer. *Fullilove* involved the "minority business enterprise" [MBE] provision of the federal Public Works Employment Act of 1977, 91 *Stat.* 116, which required a "10 per cent set-aside" of federal funds for minority businesses in state and local public works projects. The Court rejected the constitutional challenge that the MBE program "impermissibly deprives non-minority businesses of access to at least some portion of the government contracting opportunities generated by the Act." 448 *U.S.* at 484, 100 *S.Ct.* at 2778, 65 *L.Ed.*2d at 928. Although no single opinion commanded a majority, seven justices agreed that racial classifications are a permissible means of remedying the present effects of past discrimination, even though the present parties are innocent of discrimination. *See* Note, *The Supreme Court, 1979 Term,* 94 *Harv.L.Rev.* 125, 128 (1980).

The Council seeks to distinguish *Fullilove* on the grounds that no specific legislative or administrative findings of past discrimination accompanied passage of the amendments to the Law Against Discrimination, *L.*1975, *c.* 127, or promulgation of the State Treasurer's affirmative action rules, *R.* 1977, *d.* 364. Noting that the Supreme Court "has never approved race-conscious remedies absent judicial, administrative or legislative findings of constitutional or statutory violations," *Fullilove,* 448 *U.S.* at 497, 100 *S.Ct.* at 2784, 65 *L.Ed.*2d at 936 (Powell, J., concurring), appellant contrasts the legislative history accompanying the federal Public Works Employment Act upheld in *Fullilove* with the absence of such a legislative history in this case.

But the Court made clear in *Fullilove* that limited findings of past discrimination accompanying any particular enactment should not blind a court to other evidence of past discrimination

which supports remedial legislation. Thus, the United States Supreme Court rejected the argument that Congress had made insufficient findings of past discrimination before passing the Public Works Employment Act. "After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate when Congress again considers action." 448 *U.S.* at 503, 100 *S.Ct.* at 2787, 65 *L.Ed.*2d at 940 (Powell, J., concurring).

The legislation here was passed ten years after Governor Hughes issued Executive Order 21 to promote equal opportunity in State employment and State public works contracting. Like Executive Order 11246, its federal counterpart, the Governor's order was a clear response to past discrimination in the construction industry. The basis for the remedy of affirmative action in New Jersey public works projects was described thoroughly by the federal district court in *Joyce v. McCrane, supra.* Numerous studies have made New Jersey legislators and administrators aware of the under-representation of minority workers in the construction industry. *See, e.g.,* Office of Federal Contract Compliance, *Report of the Panel on Equal Employment Opportunities in the Construction Trades in Newark, New Jersey* (1970).

Only by making itself oblivious to the well-documented history of minority under-representation in the construction trades in this State could the Court invalidate the challenged legislation and affirmative action rules on the basis of insufficient findings of past discrimination. It is one thing to dispense justice wearing the proverbial blindfold to ensure impartiality. It would be quite another matter to wear blinders blocking out the manifest evidence of past discrimination which underlies this remedial legislation.

The Council seeks additional support for its constitutional challenge in Article 1, par. 5 of the New Jersey Constitution and *Lige v. Town of Montclair,* 72 *N.J.* 5 (1976). In *Lige* we struck

down the use of hiring and promotion quotas to remedy past discrimination by a local police and fire department. *Lige* involved a finding that the Town of Montclair used an employment exam that had a "disproportionately negative effect on blacks." Because the town did not offer sufficient evidence to establish that the tests were job related, the resulting presumption of discrimination was not rebutted.

Pursuant to its authority under *N.J.S.A.* 10:5–17, the Division of Civil Rights ordered that the town adopt a quota system requiring one minority fire fighter to be hired for every white applicant hired until there were at least 15 minority officers. A similar remedy affecting police department promotions was also ordered. The Appellate Division reversed the orders, 134 *N.J. Super.* 277, and the Supreme Court affirmed, holding that the remedial order violated the state constitutional rights of non-minority applicants for Montclair police and fire jobs and promotions.

The decision and the reasoning in *Lige* focused on the unfairness of rigid quotas. However, where minority hiring *goals* and not *quotas* are involved, the concerns behind the Court's result in *Lige* are not present. *Lige* struck down the Civil Rights Division's hiring and promotion quotas because they were "a rejection of the concept that the more or most qualified should be hired and promoted .... It is the racial classification irrespective of qualification that mandates its invalidation." 72 *N.J.* at 22, 23.

While the State Treasurer's affirmative action requirements strongly encourage minority hiring, they do not require the contractor to hire non-qualified employees or to disregard meaningful differences in employee qualifications. The regulations require only that the contractor make a good faith effort to attain the minority hiring goal. Moreover, there is absolutely no indication that the hiring goals have operated, or will operate, to place less qualified employees in public works contracts. We note that no contractors engaged in public work, whose

businesses would be most directly affected by having to hire less qualified employees, have sought to intervene in this suit.

Justice Schreiber was careful to note in *Lige* that the State need not be color-blind in its attempts to promote equal employment opportunity. 72 *N.J.* at 25 ("For example, ... the Town might attempt to obtain more qualified black candidates by alerting black students in colleges and recent high school graduates of the job opportunities."); *see also* 72 *N.J.* at 53 (Pashman, J., dissenting). In *Morean v. Bd. of Montclair*, 42 *N.J.* 237 (1964), the Court sustained a plan for the transfer and assignment of pupils within a school district, although the proposal was admittedly racially motivated and avowedly sought to control racial balance as among the several junior high schools. And in *New Jersey Builders Ass'n v. Blair*, 60 *N.J.* 330 (1972), we unanimously affirmed the validity of a rule requiring owners of multiple dwellings to facilitate compliance with the Law Against Discrimination by filing annual reports disclosing rentals and requiring racial identification of tenants. Justice Mountain there approvingly cited the "Philadelphia Plan" case, *Contractors Ass'n of Eastern Pa., supra*, which, as described above, upheld a minority hiring plan similar to the plan at issue here.

Moreover, *Lige*, in discussing Title VII of the Federal Civil Rights Act of 1964, referred to a federal Court of Appeals case limiting use of racial quotas to instances where there has been

"a clear-cut pattern of long-continued and egregious discrimination," and the effect of the reverse discrimination ... [is] not ... "identifiable," namely, that it is not concentrated on a relatively small group of non-minority persons. [72 *N.J.* at 19, quoting *Kirkland v. New York State Dept. of Correctional Serv.*, 520 *F.*2d 420, 427 (2d Cir.), reh. *en banc* den., 531 *F.*2d 5 (2d Cir. 1975)]

Both *Kirkland* and *Lige* preceded the United States Supreme Court opinion in *Fullilove v. Klutznick*, where the high Court for the first time approved of racial quotas under circumstances analogous to those in this case where the remedy is imposed throughout an entire industry rather than upon a particular employer.

The *Fullilove* opinion recognizes that past discrimination has placed non-minorities in a better position, and the victims of discrimination in a worse position, than each would have been in a color-blind society. Affirmative action is designed to remedy that systematic unfairness. We held in *Lige* that affirmative action in the form of a rigid racial quota offends the State Constitution. Quotas are not at issue in this case. We hold today that the State Treasurer's minority hiring goals for affirmative action in public contracting, including approval of the 25% Camden City goal, violate neither the United States nor the New Jersey Constitution. Minority hiring goals with criteria for good faith compliance are a proper means of ensuring that contractors will take affirmative action to promote equal opportunity in an industry where minorities have been severely under-represented.

C. *Constitutionality of Resident Hiring Quotas for Local Public Works Projects.*

Appellant attacks the portion of the Camden affirmative action plan that requires that 40% of all persons hired for city public works projects be city residents, claiming violations of the Commerce Clause, the Privileges and Immunities Clause and the Equal Protection Clause. Conceding that municipalities can constitutionally require that their employees be city residents, *see McCarthy v. Philadelphia Civil Service Comm'n*, 424 *U.S.* 645, 96 *S.Ct.* 1154, 47 *L.Ed.2d* 366 (1976) (upholding Philadelphia ordinance requiring city employees to be city residents); *Detroit Police Officers Ass'n v. Detroit*, 385 *Mich.* 519, 190 *N.W.2d* 97 (1971), appeal dismissed for lack of substantial federal question, 405 *U.S.* 950, 92 *S.Ct.* 1173, 31 *L.Ed.2d* 227 (1972) (upholding residency requirement for police officers); *Abrahams v. Civil Service Comm'n*, 65 *N.J.* 61 (1974) (upholding residency requirement for Newark city employees), appellants distinguish this case as involving the imposition of hiring quotas upon private contractors. While appellant's characterization of the Camden

ordinance is accurate, we do not agree that the distinction deprives the ordinance of its constitutional validity.

1. *The Commerce Clause.*

Although the Commerce Clause speaks only in broad terms of giving Congress authority to "regulate commerce . . . among the several states," *U.S.Const.*, Art. I, sec. 8, the Supreme Court has often invoked the clause to strike down state legislation that unreasonably impedes the flow of commerce across state lines. *See, e.g., Toomer v. Witsell,* 334 *U.S.* 385, 68 *S.Ct.* 1156, 92 *L.Ed.* 1460 (1948) (invalidating a South Carolina requirement that shrimp boats fishing off its coast dock in the state and pay taxes on their catches before transporting them interstate); cases collected in *Hughes v. Alexandria Scrap,* 426 *U.S.* 794, 805–06, 96 *S.Ct.* 2488, 2495, 49 *L.Ed.*2d 220, 229 (1976). The Supreme Court has applied the Commerce Clause to municipal enactments that unreasonably burdened interstate commerce. *See Dean Milk Co. v. Madison,* 340 *U.S.* 349, 71 *S.Ct.* 295, 95 *L.Ed.* 329 (1951) (striking down a city ordinance barring the sale of milk unless processed at an approved pasteurization plant within five miles of the city).

All of the leading cases invalidating state and local legislation under the Commerce Clause, however, involve state taxes and regulatory measures impeding *private* trade in the national marketplace. *See H. P. Hood & Sons v. Du Mond,* 336 *U.S.* 525, 539, 69 *S.Ct.* 657, 665, 93 *L.Ed.* 865 (1949) (referring to state "home embargoes," "customs duties" and "regulations" excluding imports). In this case, the City of Camden is not regulating the flow of commerce between private parties. The city is acting in the role of market *participant,* not market *regulator.* This distinction is crucial for purposes of Commerce Clause analysis. In *Hughes v. Alexandria Scrap, supra,* the United States Supreme Court determined that "[n]othing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over

others." 426 *U.S.* at 810, 96 *S.Ct.* at 2498, 49 *L.Ed.2d* at 231. *Alexandria Scrap* concerned a Maryland program designed to remove abandoned automobiles from the state's roadways and junkyards. The state's requirements for vehicle documentation made it effectively impossible for out-of-state processors to sell abandoned automobiles to the state. Nonetheless, the Court upheld the statute, stating that "Maryland has not sought to prohibit the flow of hulks, or to regulate the conditions under which it may occur," *id.* at 806, 96 *S.Ct.* at 2492, but rather it has entered the market as a purchaser and restricted "its trade to its own citizens or businesses within the State." *Id.* at 808, 96 *S.Ct.* at 2496.

In *Reeves, Inc. v. Stakes,* 447 *U.S.* 429, 100 *S.Ct.* 2271, 65 *L.Ed.* 2d 244 (1980), the Court reaffirmed its approach giving the States broad power to prefer their own citizens when acting as market participants. The Court held that the South Dakota Cement Commission did not violate the Commerce Clause by its decision to give state buyers an absolute preference in fulfilling their requirements for cement in times of shortage. The Court noted,

> The basic distinction drawn in *Alexandria Scrap* between States as market participants and States as market regulators makes good sense and sound law.... Restraint in this area is also counseled by considerations of state sovereignty, the role of each State "as guardian and trustee for its people," and "the long recognized right of trader or manufacturer ... to exercise his own independent discretion as to parties with whom he will deal." [447 *U.S.* at 436, 439, 100 *S.Ct.* at 2277 (citations and footnote omitted)]

This Court has endorsed the principle that the state as market participant has freedom to favor its own citizens and choose the parties with whom it will deal. In *K.S.B. Tech. Sales v. No. Jersey Dist. Water Supply,* 75 *N.J.* 272, 298 (1977), Justice Schreiber, writing for a unanimous Court, noted that a state's "purchase of goods and materials for its own end use ... is not subject to the usual Commerce Clause restrictions." The Court upheld a statute requiring contractors with state and local government to buy only American products. *Cf. McGlynn v. N. J. Public Broadcasting Auth.,* 88 *N.J.* 112 (1981) (federal commu-

nications law does not preempt state rules ensuring candidate access to a state-owned television station where State is acting in its role as proprietor of the State's public stations).

There is no question that if the City of Camden were engaged in its own public works construction, it could require that all employees on the job be city residents. When the government decides to purchase those services rather than perform them itself, it retains constitutional power to prefer its own citizens, at least to some extent. *See McCarthy, supra; Abrahams, supra.* The decision of South Dakota to prefer its own citizens as purchasers in time of emergency shortage is particularly apposite to the instant case. We have recently described the severe economic plight that has befallen the City of Camden. *City of Camden v. Skokowski,* 88 *N.J.* 304 (1982). It is not the purpose of the United States Constitution to stifle the legitimate attempts of state and local governments to deal effectively with their social ills.

We are aware of the recent decision of the Supreme Judicial Court of Massachusetts invalidating resident hiring quotas for Boston public works projects. *Mass. Council of Construction Employers v. Mayor of Boston,* —— *Mass.* ——, 425 *N.E.*2d 346 (1981), cert. granted *sub nom. White v. Mass Council of Construction Employees,* —— *U.S.* ——, 102 *S.Ct.* 1273, 71 *L.Ed.*2d 458 (1982). The Massachusetts court relied almost entirely on *Hicklin v. Orbeck,* 437 *U.S.* 518, 98 *S.Ct.* 2482, 57 *L.Ed.*2d 397 (1978). *Hicklin* involved the "Alaska Hire" law, a state statute requiring that all Alaskan oil and gas leases, easements and other related agreements contain a requirement that qualified Alaska residents be given preference in hiring. Because the law applied to "*all employment which is a result of* oil and gas leases," it "extend[ed] to employers who have no connection whatsoever with the State's oil and gas, perform no work on state land, have no contractual relationship with the State, and receive no payment from the State." 437 *U.S.* at 529–30, 98 *S.Ct.* at 2489, 57 *L.Ed.*2d at 407 (emphasis in original). In short, the state in *Hicklin* was acting in its role as market regulator

rather than market participant. We find unpersuasive the Massachusetts court's adaption of the reasoning of *Hicklin* to the context of the Commerce Clause, particularly in light of the Supreme Court holding in *Reeves, Inc. v. State, supra.*

As the Supreme Court noted in *Reeves,* "the competing considerations in cases involving state proprietary action often will be subtle, complex, politically charged, and difficult to assess under traditional Commerce Clause analysis." 447 *U.S.* at 439, 100 *S.Ct.* at 2279, 65 *L.Ed.*2d at 253. Given these factors, the Court concluded, "the adjustment of interests in this context is a task better suited for Congress than this Court." *Id.* We concur in the high Court's reasoning, and we uphold the constitutionality of the Camden resident quota, with the understanding that our Legislature is free to determine that the "competing considerations" militate against allowing municipalities to prefer their own residents for public works contracting.

2. *The Privileges and Immunities Clause.*

Unlike the Commerce Clause, the Privileges and Immunities Clause speaks explicitly in terms of affording constitutional protection against the actions of other States. "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." *U.S.Const.* Art. IV, sec. 2, par. 1.

The purpose of the Privileges and Immunities Clause is "to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned." *Hicklin v. Orbeck,* 437 *U.S.* at 524, 98 *S.Ct.* at 2486, 57 *L.Ed.*2d at 403 quoting *Paul v. Virginia,* 8 *Wall.* (78 *U.S.*) 168, 180, 19 *L.Ed.* 357 (1869).

For this reason the clause is not invoked to strike down local ordinances that favor city residents. Clearly, the Camden affirmative action plan does not aim primarily at out-of-state residents. It almost certainly affects more New Jersey residents not living in Camden than it does out-of-state residents.

Because the Camden ordinance does not affect "the States . . . treatment of each other's residents," *Hicklin,* 437 *U.S.* at 523, 98 *S.Ct.* at 2486, 57 *L.Ed.*2d at 403, it does not violate any privilege of state citizenship.

In *Mass. Council of Employers, supra,* the Massachusetts high Court rejected the privileges and immunities attack on Boston's resident quota in public works contracts "because the discrimination adversely affects citizens of the Commonwealth as well." 425 *N.E.*2d at 354.[8] This Court likewise declines to apply the Privileges and Immunities Clause in the context of a municipal ordinance that has identical effects upon out-of-state citizens and New Jersey citizens not residing in the locality.

### 3. *The Equal Protection Clause.*

Appellant contends that the Camden resident hiring quota offends the Equal Protection Clause by infringing upon the fundamental right to travel recognized in *Shapiro v. Thompson,* 394 *U.S.* 618, 89 *S.Ct.* 1322, 22 *L.Ed.*2d 600 (1969). The Court rejects appellant's challenge for the same reasons that the Court has rejected equal protection attacks on the power of municipalities to hire only their own residents as city employees.

Residency requirements for municipal employees have almost universally been upheld under the Equal Protection Clause as a rational means of furthering the city's public welfare. *See McCarthy, supra;* Note, *Municipal Residency Requirements and Equal Protection,* 84 *Yale L.J.* 1684 (1975). In *Kennedy v. City*

---

[8]The Massachusetts court in *Mass. Council,* and the New York Court of Appeals in *Salla v. County of Monroe,* 48 *N.Y.*2d 514, 423 *N.Y.S.*2d 878, 399 *N.E.*2d 909 (1979), did however invoke the Privileges and Immunities Clause to strike down statutes that gave hiring preferences in public works contracts to all citizens of their respective *states.*

New Jersey's mandatory preference for State citizens in public works contracts, *N.J.S.A.* 34:9–2, was held violative of the Privileges and Immunities Clause by Judge Dreier in *Neshaminy Constructors, Inc. v. Krause,* 181 *N.J. Super.* 376 (Ch.Div.1981).

*of Newark*, 29 *N.J.* 178 (1959), Chief Justice Weintraub describ-
ed the constitutional justification for residency requirements:

* * * Government may well conclude that residence will supply a stake or
incentive for better performance in office or employment and as well advance
the economy of the locality which yields the tax revenues. [29 *N.J.* at 184]

The Supreme Court's recognition of the right to travel as a
"fundamental right" in *Shapiro v. Thompson, supra,* (striking
down one-year residency requirements for welfare benefits), cre-
ated doubts as to the validity of *Kennedy v. City of Newark.* But
this Court explicitly rejected the "right to travel" argument in
again upholding Newark's employee residence requirement in
*Abrahams v. City of Newark, supra.*

The right to employment on a local public works
project, like the right to a city job, is not fundamental for
purposes of equal protection analysis. Therefore, discrimination
against non-residents of Camden does not offend the Equal
Protection Clause if it has a rational basis. *Allied Stores of Ohio
v. Bowers,* 358 *U.S.* 522, 528, 79 *S.Ct.* 437, 441, 3 *L.Ed.*2d 480,
485–86 (1959). The rational reasons for a city's decision to hire its
own residents in direct employment, discussed by Chief Justice
Weintraub in *Kennedy v. City of Newark, supra,* apply just as
forcefully in the context of city contracting for public works
projects. The severe unemployment in Camden and the need
for economic revitalization, noted by this Court in *City of
Camden v. Skokowski, supra,* further support the rationality of
resident hiring quotas. The 40% resident hiring quota for
Camden public works thus does not offend the Equal Protection
Clause.

D. *State Preemption of the Camden Resident Hiring Quota.*

This Court's approach to state preemption parallels the
federal analysis. When a state statute has preempted a field by
supplying a complete system of law on the subject, an ordinance
dealing with the same subject is void. *Ringlieb v. Parsippany-
Troy Hills Tp.,* 59 *N.J.* 348 (1971) (State regulation of solid waste

disposal); *Summer v. Teaneck,* 53 *N.J.* 548 (1969) (ordinance designed to prevent blockbusting); *Mogolefsky v. Schoem,* 50 *N.J.* 588 (1967) (licensing of real estate brokers). A legislative intent to preempt the field need not be expressly stated. "[W]here a legislative enactment, either expressly or impliedly, is intended to be exclusive in the field, preemption will be found," *Garden State Farms, Inc. v. Mayor Louis Bay, II,* 77 *N.J.* 439, 450 (1978).

However, Art. IV, sec. 7, par. 11 of the *N.J.Const.* mandates a liberal construction of legislation in favor of local authority. Therefore, a legislative intent to supersede local powers must clearly be present. *Kennedy v. City of Newark,* 29 *N.J.* 178, 187 (1959). As explained by former Chief Justice Weintraub,

The ultimate question is whether, upon a survey of all the interests involved in the subject, it can be said with confidence that the Legislature intended to immobilize the municipalities from dealing with local aspects otherwise within their power to act. [*Summer v. Teaneck,* 53 *N.J.* at 555]

In this case no statute expressly precludes the 40% resident hiring quota that Camden has imposed upon public works contractors. Moreover, the Legislature clearly has not preempted the field in the area of local residency requirements, having given local governing bodies discretion regarding the use of residency requirements for officers and other employees. *N.J.S.A.* 40A:9–1.3. The appellant Council therefore must argue that the Legislature has impliedly preempted the field by expressing a clear intent not to allow municipalities to place hiring restrictions on public works contractors. The Council's argument has two separate thrusts, relying both on residency requirement statutes and on the Local Public Contracts Law, *N.J.S.A.* 40A:11–1 to –40. Both arguments are unconvincing.

The Council argues that in granting a preference for all "citizens of the state of New Jersey" in public works contracts for the state and its subdivisions, *N.J.S.A.* 34:9–2, the Legislature clearly intended to preclude local resident quotas, since the quotas work against citizens of New Jersey who live outside of

the locality that has enacted the quota. The implication that appellant seeks to draw is simply too tenuous. All Camden City residents are also New Jersey residents. In no way, therefore, does the Camden resident quota frustrate the Legislature's purpose of maximizing the employment of New Jersey residents in state and local public construction.

Likewise, the contention that the Legislature clearly intended to preclude the Camden resident quota because it has explicitly provided for residency requirements in direct local hiring, *N.J. S.A.* 40A:9–1.3, but not in local public works contracting, is weak. A similar argument was rejected by this Court in *Kennedy v. City of Newark, supra.* There the petitioner argued that because a state statute required residency of municipal officers, but not of municipal employees, the City of Newark was precluded from placing a residency requirement upon city employees who were not officers. 29 *N.J.* at 186. The Court found no evidence of an intent to preempt the Newark ordinance by implication. *Id.* at 186–87.

The lack of legislation concerning local resident quotas in public works contracting is natural, given that such requirements have rarely if ever been enacted in this State. The Legislature of course has the authority to forbid or to regulate local resident quotas such as that enacted by the City of Camden. There is no indication, however, that the Legislature has already chosen to do so.

Appellant contends also that the Camden resident quota is preempted by Section 13 of the Local Public Contracts Law. *N.J.S.A.* 40A:11–13. That statute prevents municipalities from imposing specifications upon private contractors "not directly related to the purpose, function or activity" for which the contract is made. *N.J.S.A.* 40A:11–13(a). The statute also expressly precludes the requirement that any bidder be a resident of the city or county in which the contract will be performed. *N.J.S.A.* 40A:11–13(b). The law's explicit purpose is to encourage open and competitive bidding.

There is no indication that the Camden resident hiring quota has disrupted, or will in any way disrupt, the competitive bidding for Camden public works contracts. Unlike the affirmative action ordinance invalidated in *Arington v. Associated Gen. Contractors*, 403 *So.*2d 893 (Ala.1981), which required that at least 10% of each contract amount be spent with minority subcontractors or suppliers, the Camden ordinance does not exclude any contractor, subcontractor or supplier from any work awarded by the city, provided that the affirmative action requirements are followed. Although it is possible that some contractors with permanent work crews will refrain from bidding on Camden public works projects, the record contains absolutely no evidence to support that assumption. Our State Constitution mandates a liberal construction of legislation in favor of local authority. Art. IV, § 7, par. 11. The Court will not override this constitutional power based on mere speculation.

Appellants thus have made no showing that any state legislation preempts the 40% resident hiring quota in the August 1980 City of Camden ordinance.

## III

In approving the Camden affirmative action ordinance, the State Treasurer did not act outside the scope of his statutory authority under the Law Against Discrimination, *N.J.S.A.* 10:5–1 to –38. Neither was his approval an abuse of administrative agency discretion. The State Treasurer's minority hiring goals, including the 25% goal for the City of Camden, do not violate the Equal Protection Clause. The 40% resident hiring quota for Camden public works projects is also constitutional and is not preempted by state statute. We therefore affirm the decision of the Chief Affirmative Action Officer of the Department of Treasury in approving the Camden affirmative action plan pursuant to *N.J.A.C.* 17:27–6.5. Other relief sought by appellant is denied.

*For affirmance*—Chief Justice WILENTZ and Justices PASH-MAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*For reversal*—None.